UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:06-00079-CKK |
| v. | : | |
| RICARDO HENRY, | : | |
| **Defendant** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing.

While the defendant has pleaded guilty to a single health-care false statement count, the scope of his relevant conduct is much greater. As reflected in the indictment and plea agreement, the defendant orchestrated a multi-year health-care fraud scheme in which he received more than $300,000 in ill-gotten gains by making false claims to Medicaid.[1] Shortly after the government began investigating the health care fraud in late 2001, defendant attempted to obstruct the government's investigation by placing harassing calls to family members of the then-lead investigator. Several years later, partly in order to keep proceeds of the health care fraud, defendant perpetrated a related criminal fraud: he filed a fraudulent bankruptcy petition that omitted significant and valuable assets (including his 2001 Porsche Carrera Cabriolet) through which he discharged approximately $150,000 in debts. Because of the scope and depth of defendant's fraudulent behavior, he should receive no less than 27 months of incarceration as his sentence in this matter.

---

[1] In the plea agreement, the parties agreed that the loss exceeded $300,000, and that, with an offset for forfeited items, the restitution amount was $250,000.

I. **THE HEALTH CARE FRAUD**

In November 2000, defendant purchased a brand new 2001 Porsche Carrera Cabriolet. He paid $15,000 in cash, and financed the remainder of the $81,000 purchase price with a loan. Defendant subsequently purchased a second Porsche (a Boxster) in 2002. By acquiring these expensive cars, defendant committed himself to high monthly payments. He chose to meet those obligations by committing health-care fraud.[2]

Defendant's company, Insight, was an alter-ego of defendant. Defendant held the titles of President, CEO, Secretary, and Treasurer of Insight. Defendant provided his billing employee with all the information upon which Insight's Medicaid claims were based. Defendant's health-care fraud involved the following categories of false claims: claims submitted in the names of patients whose treatment had been terminated; claims in the names of family members of patients who were not themselves patients; claims in the names of patients whose treatment sessions had been cancelled; and weekly claims in the names of patients who were only seen twice a month.

Defendant directly perpetrated this fraud. In addition to ordering his billing employee to submit each individual false claim, defendant instructed his therapists to obtain social security numbers of family members of patients who were not themselves patients, thereby revealing his intent to falsely bill Medicaid in the names of those phantom patients. Moreover, defendant personally terminated the treatment of patients for whom he continued to bill Medicaid long after their treatment had been terminated. Defendant also received the remittance forms

---

[2] Given defendant's history, the government was distressed to learn that defendant has recently acquired a BMW automobile for which he took out a $30,000 car loan that requires him to pay $635 each month.

from Medicaid showing which claims had been paid. Defendant's fraud resulted in literally thousands of false claims to Medicaid. Defendant alone reaped the financial benefit from the health-care fraud.

Defendant prefers to characterize the health-care case as originating from his overprotectiveness of his patients and their privacy. Yet defendant's actual conduct reveals scant concern for his patients or their families. By falsely billing Medicaid for family members of patients who were not themselves patients, defendant created false mental health records for many individuals, including juvenile children of patients, who never actually received such treatment. Moreover, defendant presented himself to his patients as "Dr. Henry" (his office door had a nameplate identifying him as such) and signed his progress notes "RFH, Ph.D." Defendant also hung framed certificates in his office that identified him as a Ph.D. Yet defendant did not have a Ph.D. or a medical degree, and was not a doctor of any kind. Defendant's willingness to present himself falsely to his mental health patients as a doctor speaks volumes about his intent and personal involvement in all aspects of the health-care fraud.

## II.    OBSTRUCTION OF JUSTICE

When the government commenced its investigation in this case, defendant acted to obstruct justice by harassing the former lead investigator. His actions in this regard further evidence his intent and culpability in the health-care fraud scheme.

On November 2, 2001, Special Agent Gerald Goldstein, of the District of Columbia's Office of Inspector General/Medicaid Fraud Control Unit ("OIG"), requested immediate access to Insight files, pursuant to authority vested in the District of Columbia

Medicaid Fraud Control Unit.[3]  Defendant, who identified himself as a doctor, refused to provide Agent Goldstein access to Insight's files.  Instead, defendant left a phone message with a colleague of Agent Goldstein, accusing Agent Goldstein of racism.  A review of Insight's billing practices lead the OIG to serve an administrative subpoena on Insight calling for billing documents relating to one patient, and personnel files regarding one employee.  OIG served another subpoena on Insight in January 2002 seeking additional records.  Insight failed to return any records pursuant to that subpoena.

Between August 31, 2002, and September 5, 2002, defendant placed three phone calls to family members of Agent Goldstein.  In each instance, he identified himself falsely as a law enforcement officer who was investigating Agent Goldstein.

Specifically, defendant made the following phone calls:

- On August 31, 2002, defendant called Agent Goldstein's daughter at her home phone number at 8:39 p.m.  Defendant did not place the call directly, however, Instead, defendant first called his half-sister and asked her to place the call using a three-way call service after first blocking her own number by dialing *67.[4]  When Agent Goldstein's daughter answered the phone, defendant told her he was a law

---

[3] Multiple sources give the Medicaid Fraud Control Unit the right to request provider records.  D.C. Code 2001 Ed. § 2-302.08(c)(1) grants OIG agents the right to inspect provider records, as do the Medicaid Provider Fraud Prevention Amendments Act of 1984 and the Medicaid Provider Fraud Prevention Temporary Amendment Act of 2001 (D.C. Law 14-3).  Moreover, Insight's provider agreement with the District of Columbia Department of Health required Insight "[t]o provide full access to [its] records to authorized personnel of the Department . . . for audit purposes."

[4] Defendant exhibited a pattern of enlisting siblings to assist his fraudulent activities in this case.  In addition to this episode, defendant recruited his brother, as discussed infra, to aid his bankruptcy fraud.

4

enforcement officer and that he wanted to send an agent to her house to speak with her that evening about her father who, according to defendant's fictitious character, was abusing his authority and taking bribes.

- A few minutes later on August 31, 2002, at 8:42 p.m., defendant asked his half-sister to place a caller-ID blocked three-way call to another daughter of Agent Goldstein. When that daughter answered the phone, defendant identified himself as "Agent McCoy" from the Justice Department. He further stated that he was conducting an investigation in which her father was involved. Defendant, posing as "Agent McCoy," asked if he could visit her to interview her about his "investigation." He then said he would have someone from the FBI visit her later in the week.

- On September 5, 2002, defendant asked his half-sister to place yet a third caller-ID blocked three-way call to another relative of Agent Goldstein: his then-82 year-old mother. When Agent Goldstein's mother answered the phone, defendant identified himself as an employee of the Treasury Department, stating that he was investigating her son for overstepping his authority and taking bribes. Agent Goldstein's mother was so upset by the call that she broke down in tears and cried.

Defendant also placed a phone call to a former employee on January 24, 2003. Defendant had called that employee several times earlier that week in part regarding the ongoing

investigation,[5] and the employee had not returned defendant's phone calls. In the earlier phone calls, defendant had expressed irritation that the employee had not returned his phone calls. On January 24, 2003, defendant left a recorded message at the employee's home, falsely telling the employee that an arrest warrant had issued for the employee. The government has an audio tape copy of the recorded message.

In each of these instances, defendant attempted to obstruct justice. With respect to the phone calls to Agent Goldstein's family members, defendant attempted to harass Agent Goldstein and his investigation by placing ominous and threatening calls to close relatives. Because he pretended to be a law enforcement official with access to sensitive information, defendant implied to Agent Goldstein that defendant had the power and resources to find Agent Goldstein's relatives and harass them.[6] Simply put, there is no explanation for these phone calls other than harassment and intimidation.

With respect to the phone call to the former employee, defendant wished to learn what if anything that employee had told the government or knew about the status of the investigation. When that employee declined to return defendant's phone calls, defendant threatened him by telling him falsely that an arrest warrant had issued for the employee, apparently in a vain effort to motivate that employee to return defendant's phone calls.

---

[5] The government interviewed the former employee during its investigation.

[6] It is unclear and disconcerting as to how defendant obtained the phone numbers of Agent Goldstein's family members. Agent Goldstein's mother and daughters have different last names from Agent Goldstein. The fact that it would be difficult to obtain this information was particularly troubling to Agent Goldstein and his family.

Each of these episodes reveals defendant's intent and motivation to obstruct the health care fraud investigation. Moreover, the phone calls reveal that defendant personally – not an employee or representative – made the false statements to Agent Goldstein's family members and the former employee. The calls thus provide strong corroboration for defendant's thorough control of all aspects of the health-care fraud.

### III.    THE BANKRUPTCY FRAUD

As of August 2005 – almost three years since defendant knew he was under investigation for health-care fraud – defendant had amassed credit card debt of over $130,000. He also owed the Internal Revenue Service approximately $20,000. Yet defendant still owned the 2001 Porsche Carrera Cabriolet, which had been driven less than 7,000 miles in its lifetime and which retained significant value. In order to discharge his debts, defendant filed a petition for bankruptcy under Chapter 7 of Title 11 of the United States Code on August 25, 2005. While he listed all of his debts in the bankruptcy petition, defendant did not list all his assets. Most notably defendant failed to list the Porsche as an asset, despite the fact that a direct question on the petition required him to list all vehicles he owned. In fact, in response to that question, defendant listed only a Chevrolet Tracker valued at $5,000. Moreover, rather than disclose the Porsche on the bankruptcy petition as required, defendant instead paid his brother to register the car in New York in early September 2005 under his brother's name. Even though he had lived in the District of Columbia and paid for a special parking spot for his Porsche in the District since May 2005, defendant waited until November 2005, well after filing his bankruptcy petition, to register the Porsche in the District of Columbia in his own name.

Defendant also provided false statements to the Bankruptcy Court regarding other assets. Defendant provided false statements about the amount of cash in his possession, whether he owned firearms, and whether he had sold real estate within the preceding year. Defendant also failed to identify a Jamaican bank account that he maintained. Defendant received an order discharging him of his debts on January 24, 2006. The bankruptcy case closed on March 10, 2006. As of that date, defendant maintained ownership of the Porsche.

Defendant's trip to Sweden with his brother in July 2005 presents striking evidence of defendant's level of intent with respect to the bankruptcy fraud. Defendant called his brother that month to ask whether he would be interested in traveling to Sweden with defendant, with all expenses to be paid by defendant. Defendant's brother had never traveled with defendant before, and defendant had never before presented such an offer to his brother. Defendant and his brother traveled for a week to Sweden, and defendant paid for all expenses, including airfare and hotels. The very next month, defendant sought to discharge $130,000 of credit card debt in his bankruptcy petition. In addition to defrauding his creditors, defendant's "generous" offer to his brother served the dual purpose of inducing his brother to return the favor the following month by agreeing to register defendant's Porsche in New York during the pendency of the bankruptcy.

Defendant's bankruptcy fraud reveals defendant's high level of intent regarding the health-care fraud. It also demonstrates that defendant was hardly chastened by being investigated for health care crimes. Instead, he undertook to commit an additional, related $150,000 fraud, in part to maintain proceeds he obtained from the health-care fraud.

### IV.     THE GENEROUS GUIDELINE RANGE

The government respectfully recommends that defendant be sentenced to 27 months of incarceration, the sentencing cap agreed to by the parties. Defendant received a generous plea offer that fully accounted for his acceptance of responsibility. The credit he received by accepting that plea offer is the extent of the credit he should receive in his sentence.

By accepting the government's plea offer to plead guilty to Count 2, defendant receives the substantial benefit that the Advisory 2001 Sentencing Guidelines are applicable to his offense. If he had pleaded guilty to one of the offenses which occurred after November 2001, the 2006 Guidelines would have provided for an offense level of 18 and a resulting guideline range of 27 to 33 months. Defendant also received a cap of 27 months, the low end of the guideline range of level 18 for which the defendant could have qualified. Defendant also was able to avoid a possible conviction for money laundering that would have increased his offense level to 19 with a resulting guideline range of 30-37 months. The government further agreed to cap defendant's restitution at $250,000 in additional to the value of forfeited items, even though extrapolation of the known loss over all Insight's billing could have produced a loss amount exceeding $600,000. Defendant's plea agreement also gives defendant a 3-level reduction for acceptance of responsibility. Given defendant's statements to Mr. Penders, the author of the Pre-Sentence Report, about the government causing defendant's company to collapse simply because he wanted to protect patient privacy, that credit is all credit defendant should receive in this case. He should be sentenced at the top of the range - a sentence of 27 months.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney

        /s/ ATTORNEY'S TYPED SIGNATURE
BY:    THOMAS E. ZENO, D.C. Bar. No. 348623
        Assistant United States Attorney
        Fraud & Public Corruption Section
        555 4th St., N.W.
        Washington, D.C. 20530
        (202) 514-6957

        /s/ ATTORNEY'S TYPED SIGNATURE

BY:    GLEN DONATH, D.C. Bar No. 460582
        Assistant United States Attorney
        Fraud & Public Corruption Section
        555 4th St., N.W.
        Washington, D.C. 20530
        (202) 514-9555