UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:06-00079-CKK** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **RICARDO HENRY,** | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S
REVISED MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits this Revised Memorandum in Aid of Sentencing.[1]

**SUMMARY**

The scope of defendant Henry's criminal conduct is much greater than the single count of making a false statement relating to health care to which he has pleaded guilty. As reflected in the Indictment and plea agreement, the defendant orchestrated a multi-year health care fraud scheme during which his company received at least $249,743 in ill-gotten gains by making false claims to Medicaid. After the government executed a search warrant as part of its health care fraud investigation, the defendant attempted to obstruct the government's investigation by placing harassing calls to family members of the then-lead investigator. The defendant also placed an intimidating call to a potential government witness. Several years later, partly in order to keep proceeds of the health care fraud, the defendant perpetrated a related

---

[1] Although substantially the same as the Sentencing Memorandum filed on April 6, 2007, this Revised Sentencing Memorandum has corrected some numerical errors as well as edited and enhanced some arguments.

criminal fraud by filing a fraudulent bankruptcy petition in which he did not list significant and valuable assets, including his 2001 Porsche Carrera Cabriolet. Because the health care fraud and the bankruptcy fraud are relevant conduct to each other, the loss caused by the defendant for each is combined so that he is responsible for a total loss of approximately $400,000.

The government requests that the defendant be sentenced to 27 months of incarceration. Although this is the maximum sentence permitted under the plea agreement, a 27-month sentence should be considered lenient for several reasons. It results from the 2000 Guidelines Manual rather than the current manual that provides for a higher sentence; it accords the defendant a three level adjustment for acceptance of responsibility despite his conduct of obstructing justice; it sentences him to the bottom of the guideline range; it does not increase his sentence even though the defendant was engaged in money laundering, particularly as it relates to the Porsche; and it prevents the defendant from receiving the double benefit of a low sentence of incarceration in addition to a low amount of restitution. When striking the balance between the defendant's personal circumstances and the scope and depth of his fraudulent behavior, a sentence of 27 months incarceration is fair and just, if not lenient.

I.   **THE HEALTH CARE FRAUD**

Insight Therapeutic Services was the defendant's alter-ego. The defendant held the titles of President, CEO, Secretary, and Treasurer of Insight. He was completely involved in the daily operations of the company. Among other things, the defendant provided his billing employee with all the information upon which Insight's Medicaid claims were based. In October 1999, the defendant began his criminal scheme by inducing his billing clerk to submit false

claims to Medicaid. By its end in June 2002, the scheme had caused a loss to Medicaid of at least $249,743.[2]

The defendant's health care fraud involved the following categories of false claims: claims submitted in the names of patients whose treatment had been terminated; claims in the names of family members of patients who were not themselves patients; claims in the names of patients whose treatment sessions had been cancelled; and weekly claims in the names of patients who were only seen twice a month.

The defendant directly perpetrated this fraud. For instance, the defendant personally terminated the treatment of at least one patient for whom he continued have the billing employee submit false claims to Medicaid long after treatment had been terminated. In addition to causing his billing employee to submit false claims, the defendant obtained Medicaid numbers of family members of patients who were not themselves patients. This revealed his intent to defraud Medicaid because the numbers were essential to having Medicaid pay for claims submitted in the names of those phantom patients. The defendant's fraud resulted in literally thousands of false claims to Medicaid. As he acknowledged during the plea colloquy, the defendant cannot deflect responsibility from himself on the theory that he did not personally sign claim forms submitted to Medicaid. The defendant clearly knew from the Medicaid remittance forms that payment had been made for patients for whom no services had been

---

[2] This amount of loss was determined through an examination of 54% of the patient files from Insight. The examination revealed that 83% of the claims in these patient files were fraudulent. If that rate of fraud is extrapolated over the entire population of patient files, the loss to Medicaid would exceed $480,000.

provided. The defendant continued to have such claims submitted all the while knowing that the claims were for services not provided.

The defendant alone reaped the financial benefit from the health care fraud. By taking ATM withdrawals and by writing checks to himself, the defendant withdrew more than $245,000 in payments to himself between January 2000 and December 2001. During this period the defendant ordered a brand new 2001 Porsche Carrera Cabriolet. When the defendant took delivery in November 2000, he paid $15,000 in cash, and financed the remainder of the purchase price with a loan which raised the total payments on the automobile to $116,517. Although he made many payments on the 2001 Porsche from his personal account into which he had transferred money from Insight, the defendant also wrote nine checks totaling $15,233.50 directly from Insight's bank account to make payments for this automobile. These nine checks raise the amount the defendant received from Insight to more than $260,000. The defendant maintained ownership of the 2001 Porsche until it was seized at the time of his arrest in 2006.

In his letter to the Court dated June 20, 2007, which was filed July 10, 2007, the defendant claimed that he tried to protect his patients and their privacy. Yet the defendant's conduct actually reveals scant concern for his patients or their families. By falsely billing Medicaid for family members of patients who were not themselves patients, the defendant created false mental health records for many individuals, including juvenile children of patients, who never actually received any treatment. Moreover, the defendant presented himself to his patients as "Dr. Henry" (his door had a nameplate identifying him as such) and signed his progress notes "RFH, Ph.D." The defendant also hung framed certificates that identified him as a Ph.D. Yet the defendant did not have a Ph.D. or a medical degree, and was not a doctor of any

kind. The defendant's willingness to present himself falsely to his mental health patients as a doctor speaks volumes about his intent and personal involvement in all aspects of the health care fraud.

## II. OBSTRUCTION OF JUSTICE

When the government commenced its investigation in this case, the defendant obstructed justice by harassing the former lead investigator. His actions in this regard further evidence his intent and culpability in the health care fraud scheme.

On November 2, 2001, Special Agent Gerald Goldstein, of the District of Columbia's Office of Inspector General/Medicaid Fraud Control Unit ("OIG"), requested immediate access to Insight files, pursuant to authority vested in the District of Columbia Medicaid Fraud Control Unit.[3] The defendant, who identified himself as a doctor, refused to provide Agent Goldstein access to Insight's files. Instead, the defendant left a phone message with a colleague of Agent Goldstein, accusing Agent Goldstein of racism. A review of Insight's billing practices lead the OIG to serve an administrative subpoena on Insight calling for billing documents relating to one patient, and personnel files regarding one employee. OIG served another subpoena on Insight in January 2002 seeking additional records. Insight failed to return any records pursuant to that subpoena.

---

[3] Multiple sources give the Medicaid Fraud Control Unit the right to request provider records. D.C. Code 2001 Ed. § 2-302.08(c)(1) grants OIG agents the right to inspect provider records, as do the Medicaid Provider Fraud Prevention Amendments Act of 1984 and the Medicaid Provider Fraud Prevention Temporary Amendment Act of 2001 (D.C. Law 14-3). Moreover, Insight's provider agreement with the District of Columbia Department of Health required Insight "[t]o provide full access to [its] records to authorized personnel of the Department . . . for audit purposes."

In June 2002, Agent Goldstein was the affiant for a search warrant in the Superior Court of the District of Columbia which authorized the search of Insight's office. The search warrant was executed on June 20, 2002.

Between August 31, 2002, and September 5, 2002, the defendant placed three phone calls to family members of Agent Goldstein. In each instance, he identified himself falsely as a law enforcement officer who was investigating Agent Goldstein.

Specifically, the defendant made the following phone calls:

- On August 31, 2002, the defendant called Agent Goldstein's daughter at her home phone number at 8:39 p.m. The defendant did not place the call directly, however. Instead, the defendant first called his half-sister and asked her to place the call using a three-way call service after first blocking her own number by dialing *67.[4] When Agent Goldstein's daughter answered the phone, the defendant told her he was a law enforcement officer and that he wanted to send an agent to her house to speak with her that evening about her father who, according to the defendant's fictitious character, was abusing his authority and taking bribes.

- A few minutes later on August 31, 2002, at 8:42 p.m., the defendant asked his half-sister to place a caller-ID blocked three-way call to another daughter of Agent Goldstein. When that daughter answered the phone, the defendant identified himself as "Agent McCoy" from the Justice Department. He further

---

[4] The defendant exhibited a pattern of enlisting siblings to assist his fraudulent activities in this case. In addition to this episode, the defendant recruited his brother, as discussed infra, to aid his bankruptcy fraud.

stated that he was conducting an investigation in which her father was involved. The defendant, posing as "Agent McCoy," asked if he could visit her to interview her about his "investigation." He then said he would have someone from the FBI visit her later in the week.

- On September 5, 2002, the defendant asked his half-sister to place yet a third caller-ID blocked three-way call to another relative of Agent Goldstein: his then 82-year-old mother. When Agent Goldstein's mother answered the phone, the defendant identified himself as an employee of the Treasury Department, stating that he was investigating her son for overstepping his authority and taking bribes. Agent Goldstein's mother was so upset by the call that she broke down in tears and cried.

The defendant also placed a phone call to a former employee on January 24, 2003. The defendant had called that employee several times earlier that week in part regarding the ongoing investigation,[5] and the employee had not returned the defendant's phone calls. In the earlier phone calls, the defendant had expressed irritation that the employee had not returned his phone calls. On January 24, 2003, the defendant left a recorded message at the employee's home, falsely telling the employee that an arrest warrant had issued for the employee. The government has an audio tape copy of the recorded message.

In each of these instances, the defendant attempted to obstruct justice. With respect to the phone calls to Agent Goldstein's daughters and mother, the defendant pretended to be a law enforcement official with access to sensitive and derogatory information. The

---

[5] The government interviewed the former employee during its investigation.

defendant intended to convey to Agent Goldstein that the defendant had the ability and resources to find Agent Goldstein's relatives and harass them.[6] These deceitful and ominous phone calls were designed to interfere with Agent Goldstein's work on the investigation. This is confirmed by the hostility which the defendant displayed toward Agent Goldstein in his letter to the Court dated June 20, 2007.

With respect to the phone call to the former employee, the defendant wished to learn what, if anything, that employee had told the government or knew about the status of the investigation. When that employee declined to return the defendant's phone calls, the defendant threatened him by telling him falsely that an arrest warrant had issued for the employee, apparently in a vain effort to motivate that employee to return his phone calls.

Each of these episodes reveals the defendant's intent and motivation to obstruct the health care fraud investigation. Moreover, the phone calls reveal that the defendant personally – not an employee or representative – made the false statements to Agent Goldstein's family members and the former employee. The calls demonstrate the defendant's thorough control of all aspects of the health care fraud.

### III.   THE BANKRUPTCY FRAUD

As of August 2005 – almost three years since the defendant knew he was under investigation for health care fraud – the defendant had amassed credit card debt of more than $130,000. He also owed the Internal Revenue Service approximately $20,000. Yet the

---

[6] It is unclear and disconcerting as to how the defendant obtained the phone numbers of Agent Goldstein's family members. Agent Goldstein's mother and daughters have different last names from Agent Goldstein. The fact that it would be difficult to obtain this information was particularly troubling to Agent Goldstein and his family.

defendant still owned the 2001 Porsche Carrera Cabriolet, which had been driven less than 7,000 miles in its lifetime and which retained significant value. In order to discharge his debts, the defendant filed a petition for bankruptcy under Chapter 7 of Title 11 of the United States Code on August 25, 2005. While he listed all of his debts in the bankruptcy petition, the defendant did not list all his assets. Most notably the defendant failed to list the Porsche as an asset, despite the fact that a direct question on the petition required him to list all vehicles he owned. In fact, in response to that question, the defendant listed only a Chevrolet Tracker valued at $5,000. Moreover, rather than disclose the Porsche on the bankruptcy petition as required, the defendant attempted to conceal his ownership by enlisting his brother to register the car in New York in early September 2005 under his brother's name. Even though he had lived in the District of Columbia with a special parking spot for his Porsche since May 2005, the defendant waited until November 2005, well after filing his bankruptcy petition, to register the Porsche in the District of Columbia in his own name.

The defendant also provided false statements to the Bankruptcy Court regarding other of his assets. The defendant provided false statements about the amount of cash in his possession, whether he owned firearms, and whether he had sold real estate within the preceding year. The defendant also failed to identify a Jamaican bank account that he maintained.

The defendant received an order discharging him of his debts on January 24, 2006. The bankruptcy case closed on March 10, 2006. As of that date, the defendant maintained ownership of the Porsche.

The defendant's trip to Sweden with his brother in July 2005 presents striking evidence regarding the defendant's level of intent regarding the bankruptcy fraud. The

defendant called his brother that month to ask whether he would be interested in traveling to Sweden with him. The defendant offered to pay all the expenses related to the trip. The defendant's brother had never traveled with the defendant before, and the defendant had never before presented such an offer to his brother. The defendant and his brother traveled for a week to Sweden, and the defendant paid for all expenses, including airfare and hotels. The very next month, the defendant sought to discharge $130,000 of credit card debt in his bankruptcy petition. In addition to defrauding his creditors, the defendant's "generous" offer to his brother served the dual purpose of inducing his brother to return the favor the following month by agreeing to register the defendant's Porsche in New York during the pendency of the bankruptcy.

The defendant's bankruptcy fraud reveals the defendant's high level of intent regarding the health care fraud. It also demonstrates that the defendant was hardly chastened by being investigated for health care crimes. Instead, he undertook to commit an additional, related $150,000 fraud partly in order to maintain proceeds he obtained from the health care fraud.

IV.     **EVEN 27 MONTHS INCARCERATION WOULD BE A LENIENT SENTENCE.**

The government respectfully recommends that the defendant be sentenced to 27 months of incarceration. Even though this is the maximum sentence under the terms of the plea, if accepted by the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C), the sentence of 27 months still would be lenient under the circumstances of this case. The following are benefits the defendant has received already under the terms of the plea offer.

By pleading guilty to Count 2, which occurred on April 5, 2001, the defendant was subject to the advisory 2000 Sentencing Guidelines Manual. If he had been convicted of one of the offenses which occurred after November 2001, the 2006 manual would have applied. Under

the advisory 2006 Guidelines, the total offense level for more than $350,000 of loss would have been level 19, resulting in a guideline range of 30 to 37 months. If the Court determined the loss to be more than $400,000, the total offense level under the current manual would have been level 21, resulting in a guideline range of 37 to 46 months.

The defendant also received the benefit of a three level reduction for acceptance of responsibility despite the fact that obstructive conduct "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. §3E1.1, Application note 4 (2000).

In addition to a lower guideline range, the plea offer also guarantees the defendant a sentence at the bottom of the guideline range.

The defendant also was able to avoid a possible conviction for money laundering that would have increased his offense level to at least a level 20, resulting in a guideline range of 33 to 41 months.

The plea offer also took into account the defendant's inability to pay by limiting restitution to the amount of the forfeiture described in the plea offer (estimated to be worth approximately $50,000) plus $36 for the false claim count to which he pleaded guilty. The defendant should not be given the double benefit of a sentence below the guideline range in addition to a low restitution amount.

The defendant's personal circumstances do not outweigh the extent of his criminal conduct. He should not receive any additional benefits to those he has received already under the terms of the plea agreement.

WHEREFORE, the government requests that the defendant be sentenced to 27 months incarceration.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

/s/ ATTORNEY'S TYPED SIGNATURE

THOMAS E. ZENO, D.C. Bar. No. 348623
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-6957