**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **06-CR-79 (CKK)** |
| **RICARDO HENRY** | : | |

**_____OBJECTION TO PRESENTENCE INVESTIGATION REPORT, MOTION
FOR DOWNWARD DEPARTURE, AND MEMORANDUM IN AID OF SENTENCING**[1]

On December 12, 2006, Mr. Ricardo Henry entered a plea of guilty before this Honorable

Court to one count of false statements relating to health care matters, in violation of 18 U.S.C.

§ 1035.  He will appear before the Court for sentencing on December 11, 2007.  The government

has asked the Court to sentence Mr. Henry to a 27-month term of incarceration, the maximum

amount of incarceration the Court could impose pursuant to the plea agreement and the bottom of

what the government maintains is the applicable sentencing range under the United States

Sentencing Guidelines (hereinafter "Guidelines").  <u>See</u> Government's Revised Memorandum in

Aid of Sentencing (hereinafter "Government's Memorandum").  The Court should reject the

government's request because:  (1) the government and Probation Office's Guidelines calculation

erroneously includes an increase for obstruction of justice; (2) a downward departure due to

Mr. Henry's medical condition is appropriate; and (3) a review of all of the sentencing factors set

forth in 18 U.S.C. § 3553(a) demonstrates that a sentence of incarceration is not appropriate.  For

---

[1]Mr. Henry respectfully withdraws Defendant's Memorandum In Aid of Sentencing filed by his previous counsel.  Mr. Henry did not review or authorize the representations made in that memorandum.  Mr. Henry respectfully requests that the Court disregard that memorandum and not consider the requests made therein.  Rather than refiling exhibits, however, counsel requests that the Court maintain the exhibits filed with previous counsel's memorandum and cites to those exhibits herein.

the following reasons, and such other reasons as may be presented at the sentencing hearing,

Mr. Henry respectfully requests that the Court impose a sentence that does not involve a period

of incarceration, but rather substitutes an additional period of electronic monitoring or home

confinement for any period of incarceration.

### **Factual Background**

Mr. Henry is a 47-year-old man who has never before been arrested for or convicted of

any criminal offense.  He has worked hard to overcome an often debilitating disease, obtain an

education, become a therapist, and open his own business.  With regard to this case, Mr. Henry

let his struggle to maintain his business and his own sense of self worth get the better of him.

His judgment was flawed, and as a result, he made mistakes and committed a criminal offense.

However, the allegations surrounding this case do not, as the government suggests, define who

he is and do not completely overshadow his accomplishments.

Mr. Henry was born in Jamaica, where he lived with his parents until they emigrated to

the United States when he was twelve or thirteen years old.  He then lived with an aunt in

Jamaica, until he was almost eighteen and his mother was able to obtain visas for him and his

siblings to emigrate to the United States.

While still living in Jamaica, Mr. Henry was frequently ill and often experienced fatigue

and serious leg pain.  As a child, because he was frequently ill and unable to participate in the

activities other children enjoyed, he developed a love of writing and spent a great deal of time

writing poetry and song lyrics.

Upon emigrating to the United States in 1977, Mr. Henry moved to the Washington, D.C. area, where he lived with his mother and step-father.   After he moved to the U.S., he was diagnosed with sickle cell disease with thalassemia minor.

Sickle cell anemia is a "serious disease in which the body makes abnormally shaped red blood cells . . . .  These 'sickle cells' are hard and sticky and they don't move easily through blood vessels.  They tend to get stuck and block the flow of blood to the limbs and organs.  This can cause pain, organ damage, and a low blood count (anemia)."  See Exhibit A.  The restricted blood flow throughout the body causes painful seizures, referred to as "crises."  Id.  Sufferers of sickle cell disease have a more difficult time fighting other infections, because their spleens, an organ that helps fight infection, are damaged and do not function properly.  Id.  Even the common cold can be debilitating, and pneumonia can be fatal.  Id.

_____In the early 1990s, Mr. Henry was experiencing as little as one major crisis a year, with lower-level symptoms more frequently.  As the years passed, his pain and doctor visits became more frequent.  His spleen is enlarged; his liver is damaged, and he suffers from chronic stomach pain.  See Exhibits B, H.  As do the many others who suffer from sickle cell, Mr. Henry experiences chronic pain that "can be hard to bear and mentally draining . . . ."  See Exhibit A.  According to the National Institutes of Health, men, such as Mr. Henry, with the Hb SS strain of sickle cell disease have a life expectancy of 60 years.

Despite the often debilitating effects of this disease, Mr. Henry worked hard to obtain an education.  He graduated from Roosevelt Senior High School in Northwest, Washington, D.C., a year after entering the U.S.  He then desperately wanted to continue his education.  His parents, however, could not afford to send him to college and instead gave him $700 to buy a used car

and try to turn it into a taxi cab.  But Mr. Henry refused to give up on his education.  With his parents' consent, he took the $700 and used it to enroll at Montgomery Community College.  In order to earn money for tuition and books, he worked cutting grass and doing odd jobs for neighbors.  Soon, he obtained a full-time job at a department store and put himself through school.

He earned an Associates degree in psychology from Montgomery County Community College in 1983.  He earned a Bachelor's of Science degree in psychology from Howard University in 1989, and he earned a Masters degree in clinical psychology from the University of the District of Columbia in 1992.  He then sought a Ph.D. in psychology at a satellite campus of Fielding Institute for Graduate Studies, in Camp Spring, Maryland, and also took on-line courses through the Southern California University for Professional Studies.

In 1990, Mr. Henry married Jeanett Gringo, and he became a naturalized citizen on October 12, 1992.

Over the years, Mr. Henry's love of writing has continued.  He has written and published several books.  Although his books have not yet been financially successful, he continues to work on this writing and pursue his dream of becoming a successful author.  See Exhibit I.

After graduating from Howard University in 1989, he worked for three years as a security officer at the Watergate's residential facilities, as he struggled to find employment in his chosen field of psychology.  During this time, he continued to write.  In 1992, he obtained a position as a clinical manager at Second Genesis, where he worked until 1995.  He then became a therapist and a certified addiction counselor and worked at a number of different agencies between 1995 and 1999.

4

In 1999, he began a small independent mental health clinic, Insight Therapeutic Services. His business was designed to assist addicts and their families. Through this business, he and the counselors he employed provided services to numerous individuals, many of whom were referred by the Child and Family Services Agency. Although the instant offense arose out of his billing practices at Insight Therapeutic Services, the government does not dispute that Mr. Henry provided legitimate services to many individuals.

As the Court may recall, the charges in this matter arose out of a lengthy investigation. The investigation and resulting criminal charges in this matter destroyed Mr. Henry's business. He now recognizes that he has no one to blame for this but himself.

Mr. Henry's conduct not only resulted in the loss of his business, but in the loss of his marriage. He and his wife divorced in 2005, not long after he closed his business.

Since closing his business, Mr. Henry has continued working as a therapist. In 2004 and 2005, he was employed at Coates and Lane Foundation, and in 2005, Mr. Henry began working as a mental health specialist at Safe Haven Outreach Ministry. He recently obtained a new position as a therapist at United Planning Organization.[2]

Mr. Henry was arrested in this matter on March 30, 2006, and released to the High Intensity Supervision Program. Through this program, he has been on electronic monitoring for

---

[2]In the PSI, the Probation Office suggests that the Court may want to address the issue of whether there is a need to inform Mr. Henry's employer or future employers of his conviction. Mr. Henry asks that the Court address this issue and direct the Probation Office that when Mr. Henry is employed as a counselor only, with no billing or financial responsibilities, there is no need to notify his employers. And, specifically, because Mr. Henry's position at the United Planning Organization will be as a counselor and he will have no billing or financial responsibilities, Mr. Henry asks that the Court direct the Probation Office not to notify this employer.

more than nineteen months, and he has maintained full compliance with the conditions of his

release.  His Pretrial Services officer, Brian Hamilton, reports that Mr. Henry's compliance has

been excellent.  In nineteen months, he had only one violation which was for failing to report for

a drug test in April, 1996 – Mr. Hamilton explains that Mr. Henry had reported to his office that

day, spoke to him, but then mistakenly left the Pretrial Services offices without reporting for the

drug test.  He has had no other infractions of any kind and has clearly demonstrated his ability to

do well under supervision.

### Argument

When imposing a sentence, the Court must consider:

(1)     "the nature and circumstances of the offense";

(2)     "the history and characteristics of the defendant;"

(3)     "the need for the sentence imposed to – "

    (a)     "reflect the seriousness of the offense";
    (b)     "to promote respect for the law";
    (c)     "to provide just punishment for the offense;"
    (d)     "to afford adequate deterrence to criminal conduct;"
    (e)     "to protect the public from further crimes of the defendant; and"
    (f)     "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;"

(4)     "the kinds of sentences available;"

(5)     the United States Sentencing Guidelines, including policy statements;

(6)     "the need to avoid unwarranted sentence disparities among defendants with similar records who have ben found guilty of similar conduct; and"

(7)     "the need to provide restitution to any victims of the offense."

See 18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220, 259 (2005).

6

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

See 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

As the D.C. Circuit recently stated, "[a] sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence." United States v. Pickett, 475 F.3d 1347, 1353 (D.C. Cir. 2007). The Guidelines are only one of several factors the Court must consider. Booker, 543 U.S. at 259; Pickett, 405 F.3d at 1352. The Court must "evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)." Id.

**(1)    The Nature and Circumstances of the Offense.**

With regard to the nature and circumstances of the offense, the government suggests that the offense is egregious in part because Mr. Henry had "scant concern for his patients or their families." This assertion is a gross misstatement. The government has not disputed that Mr. Henry's company provided counseling services to individuals in need of such services. There has been no allegation that the counseling provided by Mr. Henry and the therapists he employed was inadequate. Mr. Henry had genuine concern for his patients and, in fact (as at least one witness before the grand jury confirmed), continued to treat some patients who had no insurance or means of providing payment.

**(2)      The History and Characteristics of the Defendant.**

Before this offense occurred, Mr. Henry worked for many years.  He worked to put himself through college, obtained a masters degree and was working toward a Ph.D.  Throughout the years, he not only maintained employment, but also pursued his writing career.  Mr. Henry has demonstrated a strong work history and desire to help others through counseling.  When considering Mr. Henry's character and accomplishments, the Court should also consider that Mr. Henry obtained these accomplishments while he suffered from sickle cell disease.

The Court should consider the illness and its affect on Mr. Henry.  Previous counsel obtained and submitted to the Court some of Mr. Henry's medical records and a letter from his physician, Dr. Peter B. Sherer.  <u>See</u> Exhibit C.  In the letter, Dr. Sherer describes Mr. Henry's disease and the effects he suffers.  At the time Dr. Sherer wrote the letter, he was not aware that Mr. Henry faced a potential prison sentence.  Recently, undersigned counsel contacted Dr. Sherer to inquire specifically with regard to the potential effects incarceration may have on Mr. Henry.  Dr. Sherer expressed concern that Mr. Henry may be placed in a situation where the officials are either unwilling to proscribe the narcotics necessary to manage Mr. Henry's pain and/or are insensitive to the severe pain caused by sickle cell disease.  In addition, he expressed concerns that, if incarcerated, Mr. Henry may not have adequate control over his fluid intake nor the ability to insure that he has an adequate intake of fluids.  If Mr. Henry experiences a crisis and is not quickly given sufficient fluids, his pain could be prolonged. Without sufficient daily fluid intake, Mr. Henry risks damage to his heart, liver, kidney and intestines.  Dr. Sherer explained that perhaps the greatest risk to patients with sickle cell disease is heart failure and that patients such as Mr. Henry must be monitored closely.  For these reasons, a downward departure to substitute

8

home detention for incarceration would be appropriate to permit Mr. Henry's doctor to continue to treat him.

In addition to speaking to his treating physician, counsel spoke with Mr. Henry's ex-wife, Jeanett Henry. Ms. Henry explained the pain that Mr. Henry suffers in a way that Mr. Henry does not freely discuss. Mr. Henry has lived with the pain of sickle cell for many, many years and, as Ms. Henry describes, he has become accustomed to doing the best he can to live with the pain and maintain his daily activities. Ms. Henry described Mr. Henry's daily efforts to work and do normal activities without regard to the pain in his joints, muscles and stomach. Over many years, she watched as he tried to ignore the pain and move forward. She describes Mr. Henry as someone who has learned to tolerate pain and does not easily complain. Despite his will to push through the pain, however, it frequently becomes debilitating. She recalls that until 1997, the pain was primarily in his legs and arms, but in 1997, he began experiencing severe stomach pains. She reported that his pain reaches the level of a crisis approximately once a week, and that the pain can be managed only with strong narcotics. On occasion, despite medication, the pain lasts for days. On one occasion she recalls the crisis lasting approximately two months. During these periods, Mr. Henry is bed-ridden and needs assistance to move to and from the restroom. Ms. Henry describes these episodes as frequent and unpredictable. Given these circumstances, a sentence of incarceration would be unnecessarily punitive. Moreover, if he does not receive adequate care (for example, if a particular guard is insensitive to the on-set of a crisis and treatment is delayed), his pain could be prolonged. See Exhibit A (http://www/nhlbi.nih.gov/health/dci/Diseases/Sca/SCA_All.html (with poor treatment pain can last for weeks)).

Mr. Henry's history and characteristics weigh heavily in favor of a sentence that does not include a period of incarceration. He is 47 years old and without any criminal history. His age supports the position that a lengthy sentence of incarceration is not necessary because, as the United States Sentencing Commission has found, recidivism rates decline relatively consistently as age increases. United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12, Exhibit 9 (May 2004).

**(3)    The Purposes of Sentencing.**

A sentence that substitutes an additional period of home confinement for incarceration would be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. Mr. Henry's arrest alone has had a significant effect of him and his life. As a result of his conduct, he realizes that he lost not only his business, but his wife. He has lived for the last nineteen months with the electronic monitoring box on his leg. The box has been a constant reminder of his wrong doing and the consequences of his conduct. Moreover, it has been a humiliating experience when anyone else sees the box. This punishment has been significant to him and any additional period would be a harsh punishment and adequate substitute for incarceration given the circumstances of this case and Mr. Henry's background, character and illness.

No period of incarceration is necessary to protect the public from further crimes of the defendant. Mr. Henry has never before been arrested for or convicted of a criminal offense. The effect that this case has had on his life – absent any period of incarceration – is sufficient to guarantee that he will never commit another offense. Moreover, as the United States Sentencing Commission has recognized, defendants without any prior contact with the criminal justice

10

system are unlikely to recidivate.  See United States Sentencing Commission, Recidivism and the

"First Offender", A Component of the Fifteen Year Report on the U.S. Sentencing Commission's

Legislative Mandate (May 2004) (offenders with no prior arrests or convictions have the lowest

recidivism rate).

      Finally, no period of incarceration is necessary "to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most

effective manner."  See 18 U.S.C. § 3553(a).  In fact, the opposite is true.  In order to insure that

Mr. Henry receives the medical care he needs in the most effective manner, the Court should not

incarcerate him, but should impose an alternative punishment – such as home detention – that

will permit him to continue seeing his doctor who is familiar with his condition and can care for

him most effectively.  While counsel anticipates that the Bureau of Prison will represent that it

can make accommodations to treat any medical condition, including sickle cell disease,[3] as

discussed above, Mr. Henry's doctor has concerns about the Bureau of Prison's ability to manage

a sickle cell crisis and the pain that Mr. Henry suffers in his muscles and joints, as well as the

ability of the Bureau of Prisons to ensure that Mr. Henry maintains a necessary level of fluid

intake, without undo exertion and stress.  The most effective manner to provide Mr. Henry with

the medical care he needs would be to impose a sentence that does not include incarceration.

**(4)**      **The Kinds of Sentences Available.**

      The Court has available the option of imposing a sentence of home confinement and/or

electronic monitoring as an alternative to incarceration.  This alternative is appropriate form of

---

[3]Counsel has contacted the Bureau of Prisons and inquired about their ability to care for inmates with sickle cell disease.  Counsel has not yet received a response.

punishment in light of Mr. Henry's background and characteristics. Moreover, Mr. Henry has affirmatively demonstrated for nineteen months that he can be successful under such supervision. During this time, he has had only one infraction which was based on a memory lapse, and his Pretrial Services officer confirms that his compliance has been excellent.

**(5)    The United States Sentencing Guidelines.**

As Mr. Henry agreed in the plea agreement, under U.S.S.G. § 2F1.1 (2000), the applicable base offense level is 6, plus 2 for more than minimal planning, plus 2 for bankruptcy misrepresentation, plus 9 for loss more than $350,000, minus 3 for acceptance of responsibility, for a total offense level of 16. Because Mr. Henry has no prior criminal convictions, he is in criminal history category I, and the applicable recommended sentencing range under the Guidelines is 21 to 27 months.

**a.  Objection to Obstruction of Justice Increase.**

The Probation Office erroneously increases Mr. Henry's offense level by two levels, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice. Section 3C1.1 applies only when: "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense[.]" Mr. Henry did not obstruct or impeded or attempt to obstruct or impede the administration of justice.

In response to Mr. Henry's objection to the application of this provision, the Probation Office stated:

> We believe the defendant is eligible for the enhancement for
> Obstruction of Justice based on the facts recited in paragraphs #32

> and #33.  We believe the defendant attempted to threaten,
> intimidate, or otherwise influence a witness (DCOIG Special
> Agent Gerald Goldstein) and therefore the enhancement is
> applicable.  USSG §3C1.1, comment(n.4(a)).  See *United States v.*
> *Jackson*, 974 F.2d 104, 106 (9th Cir. 1992).

PSI at 22.  Note 4(a) to § 3C1.1 includes within a non-exhaustive list of examples of the types of

behavior to which the obstruction of justice adjustment applies, "threatening, intimidating, or

otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or

attempting to do so[.]"

Although sentencing courts are no longer required to follow the Guidelines and must only

consider them as one of several sentencing factors, when determining the appropriate sentencing

range under the Guidelines, courts must follow the strictures of the Guidelines.  See United

States v. Price, 409 F.3d 436, 443 (D.C. Cir. 2005) (government bears burden of demonstrating

sufficiently reliable evidence of convictions).  And the government still bears the burden of

proving facts that may be relevant in sentencing.  Id. at 444.  Here, the government has not met

its burden and has not demonstrated that Mr. Henry made the telephone calls referred to in

paragraphs 32 and 33 of the PSI.

Even if the government could demonstrate that Mr. Henry made the telephone calls, these

calls do not constitute obstruction of justice under § 3C1.1.  According to the information

contained in the PSI and provided to counsel during discovery, the person who made the

telephone calls claimed that the special agent was under investigation for "bribes and

corruption."  There was no mention of Mr. Henry or the investigation of his billing practices, and

there was no suggestion that the telephone calls were in any way connected to that investigation.

While these calls contained false information and may be characterized as harassing, the

statements made were not threats, and they were not designed to intimidate or influence a witness with regard to the investigation of Mr. Henry.

The case cited by the Probation Office in support of the application of the obstruction provision contained a very different set of facts. See United States v. Jackson, 974 F.2d 104, 106 (9th Cir. 1992). In Jackson, the defendant disseminated a cooperating witness's plea agreement with the witnesses name and the words "the Rat" and "Snitch" written on top. Id. The Court found that these actions were designed to intimidate and reasonably could be perceived as a threat, potentially chilling the witness's willingness to testify. Id..

In contrast, here there is no evidence – or no reasonable inference – that the telephone call was designed to interfere with or chill the agent's investigation of Mr. Henry. In fact, there was no connection between the two. The government describes the calls as an attempt to harass and notes Mr. Henry's "hostility" toward the agent, Government's Memorandum at 8, but even if true, such conduct does not amount to obstruction of justice because there was no connection with the ongoing investigation. The government's suggestion that the calls were "designed to interfere with" the agent's "work on the investigation" is baseless – there was no such connection. The government's suggestion that by harassing the agent Mr. Henry thought he could deter the investigation is irrational – clearly if the agent connected Mr. Henry to harassment of his family he would be more, not less, inclined to seek to investigate Mr. Henry.

In addition to the telephone calls described in the PSI, the government alleges that Mr. Henry made a telephone call to a witness on January 24, 2003, and that this call constituted an attempt to obstruct justice because Mr. Henry allegedly claimed that there was an arrest warrant out for the witness. The Probation Office does not base the adjustment on this call, and

the government's interpretation of this call is not accurate.  Undersigned counsel recently spoke

to the witness who received the call, and this witness indicated that he never felt harassed by

Mr. Henry.  He noted that he did feel intimidated when government agents spoke to him and that

there was a period of time when he avoided speaking to Mr. Henry for fear that the government

would accuse him of wrong doing, but Mr. Henry never did anything to suggest that he should

not speak to the agents or that he should not be truthful with them.  The witness reports that he

and Mr. Henry remain friends today.   The January 24, 2003, telephone call does not support the

obstruction of justice adjustment because it did not constitute an attempt to intimidate or

influence the witness.  The government's description of the call as a "threat," Government

Memorandum at 8, is not accurate – there was no threat – and the government's own description

of the call as a "vain effort to motivate that employee to return his phone calls" does not support

the adjustment.

###### b.  Downward Departure Due to Extraordinary Physical Ailment.

Under the United States Sentencing Guidelines, when an individual suffers from an

extraordinary physical ailment or ailments, a downward departure is authorized.  U.S.S.G.

§ 5H1.4.  Section 5H1.4 provides

> [p]hysical condition . . . is not ordinarily relevant in determining
> whether a sentence should be outside the applicable guideline
> range.  However, an extraordinary physical impairment may be
> reason to impose a sentence below the applicable guideline range.

Id.  The conditions that warrant a departure under § 5H1.4 must be serious, but are not limited to

specific disorders or impairments.  See, e.g., United States v. Russell, 156 F.3d 687, 695 (6th Cir.

1998) (court may examine a wide variety of circumstances in determining whether departure

pursuant to § 5H1 is warranted); United States v. Ghannam, 990 F.2d 327, 329 (4th Cir. 1990)

("5H1.4 allows downward departures any time a sentencing court is presented with sufficient evidence of impairment"); United States v. Slater, 971 F.2d 626, 634-35 (10th Cir. 1992) ("chronic depressive disorder can provide basis for departure"); United States v. Rioux, 97 F.3d 648, 663 (2nd Cir. 1996) (downward departure for physical impairment appropriate when defendant suffered from diseased kidney, which, while stable, required monitoring and prescription medications); United States v. Willis, 322 F. Supp. 2d 76 (D. Mass. 2004) (downward departure appropriate where defendant had number of potentially serious medical conditions and was at age where conditions would have invariably grown worse); United States v. Dyce, 975 F. Supp. 17, 22 (D.D.C. 1997) (among other factors, defendant's stroke, which required regular medical care and prescription medication, justified departure).

As discussed above, Mr. Henry's illness causes him great pain and would make incarceration a particularly severe punishment.  Moreover, as confirmed by his doctor, incarceration could cause his symptoms to be more severe and could cause greater damage to his organs.  Because of this extraordinary medical condition, a downward departure is warranted.

### c. Guidelines Fail to Adequately Consider All Relevant Factors.

In addition, when considering the applicable Guidelines range, the Court should consider that the Guidelines calculation specifically does not take into consideration relevant factors that the Court must consider under § 3553(a).  See Rita v. United States, __ U.S. __, 127 S.Ct. 2456, 2465 (2007) (district court should not presume Guideline sentence should apply).  Section H of the Guidelines lists numerous personal characteristics that are not considered by the Guidelines, including age (§ 5H1.1), education (§ 5H1.2), emotional conditions (§ 5H1.3), physical conditions that are not extraordinary (§ 5H1.4); and employment record (§ 5H1.5).  Section

16

3553(a), however, requires that the Court consider these factors.  Here, because of the nature of

these circumstances – Mr. Henry's age, education, illness and employment record –  and because

the Guidelines fail to take these factors into consideration, the Guidelines recommend a sentence

that is greater than necessary to comply with the purposes of sentencing.

### d. Government's Argument that Guidelines Calculation is Lenient.

The government's request that the Court impose a sentence of 27 months incarceration is

based entirely its interpretation of the applicable Guidelines calculation.  The government does

not analyze this case in terms of all of the factors set for 18 U.S.C. § 3553(a).  Instead, the

government argues that a sentence of 27 months is appropriate because the government has

calculated the Guidelines leniently.  Government's Memorandum at 10-11.  This argument

obviously is flawed because – even if the government's description of its Guidelines calculations

were accurate – the District of Columbia Circuit has specifically directed that district courts

"cannot simply presume that a Guidelines sentence is the correct sentence."  Pickett, 475 F.3d at

1353.  Instead, the Court must consider all of the § 3553 factors and "evaluate how well the

applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)."  Id.

Moreover, the government's description of its Guidelines calculations as "lenient" is inaccurate.

While arguing that an increase for obstruction of justice is appropriate, the Probation

Office finds that the three level decrease for acceptance of responsibility is appropriate because

the alleged basis for the obstruction increase occurred before the plea agreement and Mr. Henry's

guilty plea spared the government and the Court a potentially protracted and costly trial.  PSI at ¶

35.  And, in the plea agreement, the government agreed that the three level decrease was

applicable.  Nonetheless, the government now argues that a sentence of 27 months incarceration

17

would be lenient, in part, because Mr. Henry received the "three level reduction for acceptance of responsibility despite the fact that obstructive conduct 'ordinarily indicates that he defendant has not accepted responsibility for his criminal conduct.'" Government's Memorandum at 11 (citing U.S.S.G. § 3E1.1, Application note 4 (2000)).  Application Note 4,  however – as both the government and the Probation Office have agreed – does not apply to Mr. Henry.  Mr. Henry was entitled to the three level reduction under the Guidelines, and the fact that he was entitled to such a reduction does not justify a sentence of incarceration.

Similarly unpersuasive are the government's arguments that the use of the 2000 Guidelines (as opposed to a later version of the Guidelines) and the fact that Mr. Henry was not convicted of money laundering warrant a sentence of 27 months incarceration.  The offense occurred on April 5, 2001, and he was not convicted of money laundering.  The supposition that if the offense had occurred at a later date or if the offense had been different in some other respects a higher Guideline range would have applied is without merit.   The factors cited by the government simply do not demonstrate that a sentence of 27 months would effectuate the purposes of sentencing set forth in § 3553(a).

**(6)     The Need to Avoid Unwarranted Sentence Disparities.**

Section 3553(a) requires that the Court consider the need to avoid *unwarranted* disparities in sentencing.  However, "the measure of whether a disparity is warranted depends upon the characteristics of the defendants and their conduct, not overall considerations of law enforcement efficiency or administrative convenience."  United States v. Austin, 2006 WL 305462 (S.D.N.Y. 2006) (quotation omitted).  Typically, the government argues for a Guidelines sentence as a means to avoid unwarranted disparities.  Here, however, such a sentence is not

appropriate because the characteristics of Mr. Henry – particularly his illness – support a finding

that a sentence of incarceration is greater than necessary to meet the purposes of sentencing and

any disparity that may arise from imposing a non-incarceration sentence in this case is warranted

based on these individual characteristics of Mr. Henry.

**(7)    The Need to Provide Restitution to Any Victims of the Offense.**

The government recently filed a Government's Notice Concerning Restitution, notifying

the Court that it would seek only the restitution related to the count of conviction.  The

government made this concession in order to avoid the need for an evidentiary hearing regarding

the amount of restitution owed, recognizing that Mr. Henry does not have the financial resources

to pay a significant amount of restitution and that the government has the ability to pursue

restitution through the civil court system.  Specifically, the government requests restitution in the

amount of $36.00, and Mr. Henry obviously does not contest this amount.

When considering the issue of restitution, however, the Court should note that the

government seized and Mr. Henry agreed not to contest the forfeiture of several items of personal

property.  According to government counsel, the total value of the forfeited assets was

$58,576.71.

The government made its concession regarding restitution voluntarily.  Mr. Henry had

agreed to pay an appropriate amount determined by the Court up to $199,743.00.  Now, however,

the government uses its own concession to argue that a sentence of 27 months incarceration is

reasonable in order to prevent "the defendant from receiving the double benefit of a low sentence

of incarceration in addition to a low amount of restitution."  Government's Revised

Memorandum at 2.  Essentially, the government argues that the plea agreement gave Mr. Henry

19

the benefit of a low amount of restitution and, therefore, a higher sentence of incarceration is warranted.  The government chose to withdraw its request for restitution.  Mr. Henry certainly did not bargain for jail time in exchange for reduced restitution.  Moreover, as the government has recognized, Mr. Henry does not have the ability to pay restitution – this was one of the reasons the government agreed to limit the amount restitution sought in the plea agreement and ultimately decided not to seek restitution.  Imposing a sentence of incarceration because of Mr. Henry's inability to pay restitution – as the government suggests – would be unconstitutional. See William v. Illinois, 399 U.S. 235 (1970) (additional incarceration based on involuntary nonpayment of fine or court costs violates Equal Protection Clause) ; Tate v. Short, 401 U.S. 395 (1971) (requiring indigent defendant who could not pay fines to serve additional prison time violated Equal Protection Clause).

## Conclusion

Since his release in this case more than nineteen months ago, Mr. Henry has maintained full compliance with all of the conditions of his release.  This is his first criminal conviction, and he has demonstrated that he deserves a second chance.  As the United States Attorney himself has recently noted, "'everybody deserves a second chance.'"  Washington Post (May 8, 2007) (quoting United States Attorney Jeffrey Taylor).  Moreover, as the President of the United States, George Bush, has recently noted a probationary sentence is indeed a harsh sentence where (1) the defendant is a first time offender; (2) the defendant has lost his job; (3) the reputation the defendant gained through years of professional work is forever damaged; (4) the defendant's family have suffered immensely; and (5) the consequences of the felony conviction on the defendant's former life will be long-lasting.  See

http://www.whitehouse.gov/news/releases/2007/07/20070702-3.html, Statement of President

George W. Bush, accompanying Proclamation 8159, Grant of Executive Clemency, 72 FR 37095

(July 2, 2007).  Such is the case here.


Respectfully submitted,

A.J. KRAMER

FEDERAL PUBLIC DEFENDER

　　　/s/

_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20004
(202) 208-7500 ext. 109